The case for argument this morning is 15-5069, Shields v. U.S., Mr. McNeil. Thank you, Your Honor. And I reserve two minutes. The trial court made three legal errors when it interpreted the Cobell lease to unambiguously. Applying the two Shields facts, the first is a kind of a cart and horse error. The court held that law absolutely did not require the trial court to look at context evidence before determining the plain meaning of the language. That is shown on pages 23 and 24 of the trial court opinion, and that's contrary to established Hornbook law and the court's own precedent. As restatement, second of contract section 212 makes clear. The trial court then compounded that first error by rejecting the reasonableness of the two Shields interpretation that the Cobell release does not cover the two Shields facts. Do you have any arguments if the Cobell release does cover all actions up and through September 30th of 2009, do you have any arguments that the government breached the trust in any way after September 30th, 2009, so that if you lose on the interpretation of the settlement argument, is there still any case here? Yes, two. First of all, the government has a fiduciary duty to have disclosed information under the Shoshone case that Judge Hewitt had established several years ago in a case that's almost on all fours. And one of the problems there was that it was a hidden type of claim. It was a hidden scheme, and this complaint goes into great length on the hidden nature of that scheme, which literally depressed the price of the market. The government furthermore stamped on this lease to two Shields and others, this lease is in the best interest of the Indian mineral interest owner and never changed that language. Therefore, by the time of the release, the information, the hidden nature of it, and the continuing nature of it had not been revealed. So yes, I think that there is language to that effect and indeed evidence to that effect that clearly raises. And apart from that, is there any other argument, were there any other government actions after September 30th, 2009 in this case? It seems like everything, all the actual affirmative actions like the BIA approvals and things like that of the transfers all took place prior to September 30th, 2009. I just want to make sure I'm not missing any of the facts. Between 2009 and the announcement of this huge billion dollar transaction by Williams, who had been behind the scenes all along according to our pleadings through metal men, the government continued to ratify and do normal work on those leases. That is the evidence. Yeah, but I thought there was an argument that you were relying on the subsequent. In other words, you were saying that post that date in 2009, there was this acquisition by Williams of Dakota III, and somehow that was when your claim arose based on that acquisition. So you were trying to get this out from under Cobell in terms of the time frame. Is that not your argument? Yes, and as our pleading says, the culmination of the scheme, the events in the scheme did not culminate until that huge roll-up occurred. Yeah, but the question there in the government, I think it's the government's position that you can't use that date because the government had no authority over that acquisition, that you are tied to the date in late 2009. You can't transcend that and say, no, the facts didn't arise until the acquisition because the government had no authority over that acquisition, right? We're arguing that the government, one, could have stopped it. They have the right to revoke consents. They could have revoked assignability, and they could have done something. Yes, they did not. And on that basis, you're arguing that therefore they shouldn't come under Cobell because their claim didn't arise until those actions occurred? I'm arguing that that's one reason, but there are others, including the fact that the government did not give full information under Shoshone of what the situation was so these folks could make an informed choice. When and what exactly were they supposed to disclose? In our complaint, we mentioned a number of things. The paragraphs of our complaint deal with the government's inside information on these reserves. The U.S. Geological Survey, others knew this was huge. The magnitude of the difference between strip oil prices that were paid for this oil and the fact that these are literally the richest oil and gas reserves in American history is just dramatic, and the government knew that. It wasn't a matter of finding them. They were already there. It was a matter of technology, and the government was well ahead of the curve on knowing what that technology could do. They just did not. They were just rolled over and continue to be rolled over by this improper influence, which they could easily have stopped. And at what point did this duty to disclose arise? I think the duty disclosed was clearly prior to Cobell Settlement. It should have been before the, but that's clearly before that period because as Judge Hewitt points out in the Shoshone case where the folks had been paid royalty interest for years, but the government had failed to disclose full information that the oil and gas companies were undervaluing them and nevertheless signed a release saying they wouldn't go after that. That release was not valid because the government had not provided full information. The government, as listed in our complaint— Wait, when you say release, you're talking about the release under Cobell that they didn't retain their right to do—that they didn't opt out of the class. Is that what you're talking about? I'm saying that prior to the Cobell Settlement, all this information should be revealed. We cite, for example, in the complaint details about as April of 2012, one official expressly said in the government, I didn't have time to do anything. There's other information that didn't do any due diligence. There was absolutely no due diligence. There are others that said that we were pressured and pressured and there was a land run and we just folded. There's another superintendent of the PIA on Fort Berthold that said I wanted to get it staffed up, but I never had time to do it. There's a lot of information that was said later, after this lawsuit was actually filed, and after we had had a chance in 2011 to do the actual due diligence that's required after this big sale was announced, that was never revealed ahead of time. Those are factual inquiries. The problem here is it's way too premature to come to a decision as a matter of law on those issues. Ultimately, the court, after hearing the factual record, may decide that maybe there was not enough or that enough information was disclosed, but it's a heavy argued factual dispute and it's heavily documented in this complaint, which really, if true, is quite a horror story on what happened. Is there someplace specific in your brief that you make an argument that the government, though it didn't take an action with respect to the ultimate transfer to Williams, had the authority and obligation to review and intervene? Yes, and we cite the various provisions. I will get you the site, Your Honor, but we talk about their strong authority. Just to be clear, I asked about your brief. I didn't ask about your complaint. Oh, I'm sorry. Yes, sir. I'll get that to you in just one second, sir. Just briefly, let me mention the third error, and that is the court erroneously concluding the government didn't have a duty to disclose that full information, as I've already mentioned in the Shoshone case. Can I ask, is there any aspect of, I don't have the Shoshone opinion with me. That's from 2003, right? Yes. Is the analysis there consistent with Navajo II, Chickarilla, and our Hopi tribe? Yes. In terms of the demand, really quite stringent demand for specificity of the particular duty that is being relied on? Yes, it was this court. I mean, the Court of Federal Claims, it did not come to you, but the Court of Federal Claims didn't make that ruling. Right, but again, what I want you to focus on is the date, 2003. The law has substantially tightened the requirement of specificity for the asserted duty since then. Okay. If I might respond to that. Please. That's what I asked. I think, number one, the common law duty that's inferred even by those later cases, once there's a money-mandating fiduciary duty, is a common law duty, and this court has established that in front of me as well as the Supreme Court in its cases. A common law duty, by definition, includes a fiduciary duty. But here we have one fact that goes one step further. The fact that the argument of the government is, well, we didn't have a duty to disclose, even though that's a common law duty. The problem is the government did disclose. They did tell these Native Americans, this is in the best interest of the mineral interest owner. They stamped the lease. Once that disclosure occurred, it has to remain accurate, and it needs to be changed if the government knows it's not. We have pled information that the government knew it's not and continue to learn information that it was wrong before the Cobell Settlement occurred. That's why we have asked in Rule 56 what the government knew, what negotiations it had, because, as I was going to get into on my first point, the Restatements, Section 212, which is on interpretation of contracts, cited approximately 475 times by this Court in interpreting contracts, has paragraph B or comment B on plain meaning and extrinsic evidence. And it says that, like the trial court said, it sometimes said that extrinsic evidence cannot change the plain meaning of a writing but meaning can almost never be plain, can almost never be plain except in context. In fact, the next sentence said, this principle is not limited to cases where ambiguity is already established. And then it goes on to say there are four types of evidence right here in comment B. Can I just ask? Yeah. That kind of language which you were just reading from the American Law Institute's non-authoritative summary of principles, and it's a mix of prescription and description. Have we as a court said those things? It's a good question. You have followed it in metrics and in Rockies. Let me give you the example. The four types of evidence were looking at the nature of the relationship, which here was a fiduciary one, at the subject matter of the transaction, which was a release, preliminary negotiations and statements made by their end, which we were trying to get from the government and have cited some issues here, and the course of dealing between the parties. In metrics, this court said the course of dealings between the parties was critical. And indeed, even though the language was straightforward, in the metrics case, there was this issue about lamps being replaced just before a NASA contract was completed. The government here, as in here, took the isolated position that lamps, meant all lamps in this big NASA project. And the government said, wait a minute, we want to go back and look at the context and the negotiations. It was found out that the government proposed that the custom and usage in the lamp case was that you only replace lamps that were out. Common sense, but not what the plain language appeared to say at first glance. Rockies, the more recent case, which the trial court didn't even address because it had just come out, is a case where the preliminary negotiations were critical to the case as well. And therefore, the court overruled. Here was the issue there. There was a policy, a forward policy that the government could change the contract if policy changed, but looking at negotiations, that didn't happen. And so those two cases applied the restatement sector. Okay. We're into your rebuttals, so why don't we hear from you. Well, thank you very much. Mr. Oakley? Yes. May it please the Court, my name is Robert Oakley. I'm here on behalf of the United States. Your Honor, the Covell v. Salazar case was a very big deal for the Department of Justice and for the United States as a whole. It was very hard-fought litigation. It went on for years. I believe there were ten appeals to the District of Columbia, I'm sorry, the D.C. Circuit. And so the government wanted a clean slate here. So when it finally reached a settlement with the Covell plaintiffs, it wrote broad releases, and those releases clearly encompassed the claims Ms. Two Shields and Defender Wilson want to bring here. Those claims include claims that the government mismanaged land assets, held in trust. But why isn't there still an open question of Lee Sworn's review with regard to what they knew and when they knew it and what the government said? Well, actually, I thought I heard counsel, because, again, if you look at the language of the settlement agreement, it applies, land administration claims apply to both claims that are known and unknown. Now, if that language was wrong or unacceptable or unconscionable, someone should have raised that in the Covell decision. But it was not. My recollection is there's no mention of that in the district court decision. There's no mention of it in the D.C. Circuit decision. The Supreme Court denied cert. And so that's the end of the matter. Maybe we can't speculate, well, what if that issue had been raised? But it was both known and unknown. But in a hypothetical circumstance, if the government had intentionally hidden or kept away information to allow plaintiffs to know that they might have had a cause of action, are you suggesting that, nonetheless, Covell would bar that cause of action? That's interesting, Your Honor, because I have in the back of my head, but I'm reluctant to state it as a firm principle of law because it is in the back of my head, that there's a difference between intentional concealment and, in other words, that someone took active measures to not inform someone of information that they had a duty to do so. But that suggests that perhaps there is some ambiguity in the language of the Covell settlement with respect to what it means to say known or unknown. Well, they have never developed in their briefs any argument that the government actively was hiding information. And, in fact, they say in their... Well, you say, I mean, the problem is you use the word they've never developed. Okay. And your friend would say, well, yeah, and we want an opportunity to develop it through discovery and otherwise. And also, though, my friend alleged in his complaint, over several pages, how much information there was out there, including some information that Ms. Tushiel's participated in, where there was a belief in this area and in Indian country in particular, but particularly in this area, that leases were going for below market rates. And that's the ultimate of their claim. And, by the way, counsel conceded that those claims could have been brought before the Covell settlement in his argument. And so, again, if you look at the language, they say of both the way the claims are defined, the key date being September 30th, 2009, it's claims, known or unknown, that could have been asserted. And he's agreeing those claims could have been asserted. As to having to, for the government to have to prove that they either did know or that they're... Well, in any event, I would fall back on, to the extent that he says it's in the complaint, I don't see... It certainly wasn't argued in the brief, and I don't think it's been alleged with the kind of particularity which is required for fraud, because we would be talking about positive fraud. Their approach has been more to stress the government, or to allege that the government has been negligent. Actually, I shouldn't say even more so. It's really been their approach. They say that they use the illustration of a rubber stamp, I think, in the reply brief, that that's all the government did. It just ignored, it didn't do anything. Again, counsel said they did no due diligence. So if they didn't do any due diligence, the only thing I could say is something about the USGS having some knowledge, which I'm not recalling that in the complaint either. But we don't know, right? We don't know what the government knew and when it knew it, whether they had... And do you concede then that if they knew something before the September 2009 date, they did have a duty to disclose? No. I would say that if the government actively concealed it. But when we talk about the government, for example, you're talking about USGS, we're talking about a huge institution. Somebody who may know something somewhere, who has no power in terms of approving their leases... You started off 30 seconds ago by saying we don't know. And I think your friend would agree. We don't know. That's why we need to... No, I'm sorry. I don't mean to develop instant amnesia, but when I say we don't know, I'm just kind of bowled over by the concept that if they can elect that the United States, anybody in the United States, whether they were in charge of approving this lease or not, knew something, then they have a duty to disclose. I mean, this goes to their duty to disclose argument. They don't identify a statutory argument here that would make that, mandate that as a duty. They waive known and unknown claims. So if the claims were unknown, that's unfortunate, but they could have raised it in Cobell. They could have opted out of Cobell. Those are two separate things. Yes, those are two separate things. We are suspicious, but we don't know enough, so we're not going to join and we simply opt out. Or they could have made an objection to approval of the settlement on the ground. There's too much unknown. Exactly. Am I understanding right? There's no dispute here about adequacy of notice to the particular claim. No. They have never argued that they didn't get notice. They are not on the list of people who opt out. And let me just go back again to this duty, this known or concealment. This is an argument that could and should have been raised into the Cobell settlement, that the scope of the release is too large, but no one did. Are there any actions that the government took after September 30, 2009, that were specifically identified here? No, but one was for the first time an oral argument. I want to go to that. I think it was Judge Post asked counsel whether the government could have disallowed the Williams Company's acquisition of these leases through its purchase, and this is important, its purchase of all the Dakota III assets. And the answer is no. Now, this argument is not addressed in our brief because they never raised it. That's why he said he was going to get you the citation to it in his brief. He can't. It's not there. If you want to hear now, we'd have to do supplemental briefing. But the reason the government can't is this was not an assignment of leases to the Williams Company. The Williams Company just bought up everything associated with these Dakota III companies, including things like pipelines. So there was no BIA approval of transfer from Dakota to Williams. There was no BIA approval of that. No, because there was no transfer from Dakota to Williams. Williams bought Dakota. No, I understand. Were any of the leases at issue in this case entered into by the government after September 30, 2009? Not these leases. As we show, the leases were approved, I believe, in February, and the assignment which we could approve to the Dakota III companies occurred in late April 2009. Can I just ask? I don't know if it makes a difference, but you have variously said that Williams bought the company. Yes. And on the other hand, you have said that it bought all of the company's assets. Which is it? My understanding is they bought the company, including all of its assets, and I believe there are companies. There are various Dakota III. It's a little confusing. There seem to be various Dakota III entities out there. Conceivably, one would actually require an assignment and one would not. Yes. I suppose if it were a transfer of assets as opposed to an acquisition of the entire company, I could see the argument. But again, they've never raised this point. And I believe there are documents they cite in the appendix news articles showing Williams just went out and bought the company. What they did with them after they bought them, I don't know, but that's different from an assignment of a lease. Had the lease been assigned, yes, approval would have been required. Now, with reference to the Shoshone case, and this somewhat gets back to the dialogue that we've had on knowledge, in addition to Shoshone being pre-Navajo I and II and Hickory in the other cases, it didn't have at issue a settlement agreement approved by Congress. There was a tremendous due process here. Approved by Congress, which allowed parties to opt out, which was approved by the D.C. District Court and then by the D.C. Circuit. Certain positions were filed and denied. And it's a final judgment. And that language did refer to known or unknown. It addressed it. And no decision by this court saying that, and even if there were language in this court disapproving in general of the release of unknown claims, the Shoshone case cannot be a basis for undoing a final judgment that we have in the Covell case. On the question of extrinsic evidence,  What was the contract language in Metric? You quoted the contract where they did in Rockies. Rockies clearly had an ambiguity because it referred to a change in government policy. That's why I asked about Metric. Yeah, I don't think so. My recollection is that Metric is in line with this court's decision, when you actually read it, is in line with this court's decision holding that decision, I should say, holding that absent an ambiguity in the language, there's no basis for allowing use of extrinsic evidence. And actually what Metric held was that it held that evidence of a trade practice, and that's been one of the few areas that this court has been willing to go beyond the plain language of a contract, cannot be used to, quote, to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting. But you don't, as you stand there right now, No, I'm sorry, I don't have the case with Metric. No, I'm sorry, I do not. But again, I think if you look at the case, We'll spend a minute talking about the takings claim. Yes. And I think one of the arguments you make is this is just like the due process claim in front of the DC Circuit. How is that so? Well, that is the basis that the CFC ruled on. One of the basis, I should say, is that this is really a complaint about the class certification process and that that improperly occurred because you had really two forms of class certification. That's not a basis for rejecting the takings claim, right? I mean, that's just Well, I think, I mean, I mean, it may be a comment on what one thinks of what's going on. It is, Your Honor, it is a, well, I think it's right. It's a more difficult argument. A much easier argument is opt out. The government, the best cases that they can come out up with from this court, which indicate any kind of classification exists, is where arguably Congress took away claims but provided no alternative for them. Here they could have opted out. And so it's But I think, on that point, I think you only cite to us one case. The Little Wolf case is the only one. The Little Wolf case, but again, Well, the Little Wolf case is pretty much on point because they had a very short statute of limitations. They could either go through an administrative process Yeah, but you haven't cited cases other than that case. No, I haven't. But they haven't cited a case where the opt out provision exists. And I think that's crucial because as long as you have a mechanism to preserve your claims, I don't, there can't be a taking. There's a taking in these, there's arguably a taking in these other cases where the government allegedly cuts off your right to recover and gives you no other alternative means of litigating the matter. And there's case law from the Ninth Circuit. I realize it's the Ninth Circuit, it's not the Court of Federal Claims or it's not the Federal Circuit, but that property interests don't exist in a non-final litigation judgment. And that's what these, these clearly are not final litigation judgments. So I guess if the panel has nothing else. Thank you. Thank you. Two things, Your Honor. There are, there's further ambiguity because the trial court cited on page 25, the visit basis of the plain language, the land administration claim definition, which had all claims that could have been asserted. However, the release language, and that's on page 653 of the record. However, the release language itself, which you never addressed on page 8686, says claims only that claims that should have been asserted. Should implies must. Could implies possible. And I think that's why these cases along the line of the accrual cases are very important for you to consider. Because the accrual cases and the kind of the should concept, you must do it, tie it or delay it when there is some sort of hidden scheme, as in Bowen, the U.S. Supreme Court case, where the beneficiaries knew their benefits had been cut, but didn't know about the scheme underlying it. And it also fits the idea that this court has established in Kukwuda that all events necessary to that scheme apply. It should be, or have to run in order to define the ultimate injury, which only could have been done through that scheme that started in 2007 with Williams behind the scene using as a puppeteer other folks until it wrapped all this massive thing up in late end of 2010. As to our pleading, yes, our pleading affords, among other things, to page 26, starting at page 109 and following, that the government went ahead and actually allowed assignability without any government check and never took that power back when it realized it was being, even though there was a scheme afoot, to take advantage of that to allow that ultimate rollout. And despite some protests, the government went ahead and did that anyway. So I really appreciate your time today, Your Honor, and we argue that this is just a little premature. Thank you. Thank you. We thank both parties and the case is submitted.